[No. B221322. Second Dist., Div. Seven. May 21, 2012.]

MARY CAMPBELL, Plaintiff and Respondent, v.
FORD MOTOR COMPANY, Defendant and Appellant.

---

---

## COUNSEL

Nixon Peabody, Ronald F. Lopez, Lauren Michals, Margarita Gevondyan; and Craig Morgan for Defendant and Appellant.

Waters, Kraus & Paul, Paul C. Cook and Michael B. Gurien for Plaintiff and Respondent.

---

## OPINION

## WOODS, J.—

### *INTRODUCTION*

Plaintiff, a California resident (since 1956) who had lived in New Jersey until 1951, filed a premises liability action against Ford Motor Company, alleging she had been diagnosed with mesothelioma as a result of her exposure to asbestos from laundering her father's and brother's asbestos-covered clothing during the time they worked with asbestos as independent contractors hired by Ford to install asbestos insulation at its Metuchen, New Jersey, plant. At trial, the jury found Ford liable for 5 percent of the plaintiff's damages and awarded her $40,000. Ford appeals, claiming (1) the New Jersey statute of repose bars plaintiff's action and (2) it owed plaintiff no duty in this case. We disagree on the first point but agree on the second and therefore reverse.

## FACTUAL AND PROCEDURAL SUMMARY

In 2004, Eileen Honer was diagnosed with mesothelioma.[1] A few months later, she filed a complaint asserting a premises liability cause of action against Ford Motor Company (among other defendants), alleging her father and brother had worked as insulators at jobsites including Ford's Lincoln-Mercury plant in Metuchen, New Jersey. As a result, she alleged, they were exposed to asbestos-containing products which caused their clothing, bodies, vehicles and tools to be contaminated with great quantities of respirable asbestos fibers; Honer then breathed these fibers because of her direct and indirect contact with her father and brother as well as their clothing and other belongings and this asbestos exposure caused her mesothelioma.

According to trial testimony, Eileen Honer was born in 1933 and lived in her parents' home in New Jersey until she turned 18 in 1951. Beginning around the age of 11 or 12 and for as long as she lived there, Honer's chores included doing the family's laundry. For about 25 years, Honer's father (Joseph Mara, Sr.) worked as an asbestos insulator with Charles S. Wood & Co. until becoming a supervisor with another insulation contractor in about 1948. Beginning in 1945, Honer's brother (Joseph Mara, Jr.) also worked for Charles S. Wood & Co. as an asbestos insulator. Before washing her father's and brother's work clothes, Honer would have to shake them out because they were "dirty," "dusty," and "nasty."

In the mid-1940's, Ford Motor Company entered into contracts for the construction of a new Lincoln-Mercury assembly plant in Metuchen, New Jersey, including asbestos insulation work on pipes, ducts and oven spray booths used for drying freshly painted cars. Ford knew asbestos was being installed on its premises; it knew of contracts between general contractor Wigton Abbott and subcontractors August Arace and Charles S. Wood for the installation of insulation at the Metuchen plant; contracts specifically referenced a wage agreement negotiated with the International Association of Heat & Frost Insulators & Asbestos Workers (Local 32); Charles S. Wood's letterhead referred to asbestos, and the general contractor's correspondence from July 30, 1947, to Ford included copies of these agreements.

Between 1947 and 1948, Honer's brother worked at the Ford plant for about one year while her father worked there for about six months. Ford owned the Lincoln-Mercury plant from the start of construction in 1945

---

[1] After judgment was entered in her favor, Honer died (on Nov. 6, 2009). Thereafter, her daughter (Mary Campbell) filed a motion to continue this action as her mother's successor in interest pursuant to Code of Civil Procedure section 377.32, and we granted this motion.

through ceasing operations in 2004. Ford took possession of the property during the last three or four months Honer's brother worked there. A Ford employee regularly checked on the progress of the insulation work.

Victor Roggli, M.D., testified that, as a result of doing the family laundry, Honer received a substantial exposure to asbestos. The asbestos fibers deposited on her father's and brother's clothing would be liberated when the clothing was shaken out. Such household exposure to asbestos meant a four to eight times greater risk of contracting mesothelioma. Those exposed through family members working as insulators had the greatest exposure to asbestos and thus the greatest risk.

According to Dr. Roggli, by 1930, as evidenced by documents including the seminal "Merewether Report" (Merewether & Price, Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry (1930)), it was known that asbestos was a toxic substance that could cause fatal lung disease; it was known that it was important to use dust suppression methods (wet down, ventilation, protective equipment) to reduce the risk of disease; it was known that the use of products containing asbestos (not only mining or manufacturing asbestos) could cause dangerous exposures; it was known that bystanders were at risk of exposure; and it was known that there was a considerable latency period between asbestos exposure and disease manifestation. As evidenced by case reports, the association between asbestos exposure and cancer was known by the 1940's.

By the early 1900's, Dr. Roggli testified, the dangers of toxic substances being transferred from the workplace to the home through workers' clothing as well as methods for preventing such "take home" exposures were known. He cited industrial hygiene textbooks, such as the 1913 textbook Safety, Methods for Preventing Occupational and Other Accidents and Disease by William H. Tolman and Leonard B. Kendall; there was no dispute that asbestos was a known toxin by the 1930's. According to Dr. Roggli, both asbestos hazards and the risk of toxic take home exposures had been reported in the scientific literature before 1945.

Ford's own expert witness (Larry Roslinski) acknowledged that in 1930, according to the Merewether Report, "exposure to asbestos could be hazardous to human health," and the occupational health community—including the industrial hygiene community—knew of these findings in the 1930's. Roslinski was a certified industrial hygienist in the late 1960's through the 1970's and

an industrial toxicologist with Ford from 1973 through 2002; for the last two years, he was the manager of Ford's Occupational Health & Safety International Department. Beginning in 1937, Ford had industrial hygienists on staff when it established its industrial hygiene department. Ford established its industrial hygiene department in the 1930's, and that department was responsible for worker safety with respect to both acute and chronic hazards. It maintained a library of medical and scientific journals. Roslinski acknowledged the Merewether report was an authoritative source known in the occupational safety community in the 1930's, and it stated that asbestos exposure was hazardous.

Jurors were instructed as follows:

"Eileen Honer claim[s] that she was harmed because of the way Ford Motor Company managed this property. To establish this claim [she] must prove all of the following:

"One, that Ford Motor company owned the property; two, that Ford Motor Company was negligent in the use or maintenance of the property; three, that [she] was harmed; and, four, that Ford Motor Company's negligence was a substantial factor in causing [her] harm.

"A person that owns property is negligent if he or she fails to use reasonable care to keep the property in a reasonably safe condition. A person that owns property must use reasonable care to discover[] any unsafe conditions and to repair, replace or give adequate warning of anything that could be reasonably expected to harm others. In deciding whether Ford Motor Company used reasonable care you may consider, among other factors, the following:

" 'A,' the location of the property; 'B,' the likelihood that someone would come to the property in the same manner as Eileen Honer's father and brother did; 'C,' the likelihood of harm; 'D,' the probable seriousness of the harm; 'E,' whether Ford Motor Company knew or should have known of the condition that created the risk of harm; 'F,' the difficulty of protecting against the risks of such harm; and, 'G,' the extent of Ford Motor Company's control over the condition that caused the risk of harm.

"Now, Ford Motor Company was negligent in the use or maintenance of the property if, one, a condition of the property created an unreasonable risk of harm; two, Ford Motor Company knew [or] through the exercise of reasonable care—should have known about it, and; three, Ford Motor Company failed to repair the condition, protect against the harm from the condition, or give adequate warning of the condition.

"[I]f an unsafe condition of the property is so obvious that a person could reasonably be expected to observe it, then the owner does not have to warn others about the dangerous condition."

Under *Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721], Ford requested a modified version of CACI No. 1009B ("Liability for Unsafe Conditions—Retained Control—Modified") stating as follows: "A premises owner, such as Ford, is not liable to Plaintiff for injuries causes [*sic*] by the actions of independent contractors on Ford's premises, unless Ford affirmatively contributed to plaintiff's alleged injury. [¶] Plaintiff claims that she was harmed by an unsafe condition through an employee of [name of employer] while that employee working [*sic*] on Ford's property. To establish this claim, Plaintiff must prove all of the following: [¶] 1. That Ford owned the property; [¶] 2. That Ford retained control over safety conditions at the worksite in a way that affirmatively contributed to Plaintiff's injury; [¶] 3. That Ford negligently exercised its retained control over safety conditions by [specify alleged affirmative negligent acts or omissions]; [¶] 4. That Plaintiff was harmed; [¶] 5. The harm to Plaintiff was reasonably foreseeable to Ford; and [¶] 6. That Ford's negligent exercise of its retained control over safety conditions was a substantial factor in causing Plaintiff's harm." The trial court refused the instruction.

In its special verdict, the jury determined (1) Ford owned the Ford-Lincoln Mercury plant; (2) it was negligent in its use or maintenance of the property during the time Honer's father and brother worked on the premises; (3) Ford's negligence was a substantial factor in causing harm to Honer; (4) Honer suffered damages in the amount of $800,000; and (5) Ford was responsible for 5 percent of Honer's damages.[2] Accordingly, judgment on this special verdict was entered in Honer's favor and against Ford in the amount of $40,000. The trial court denied Ford's subsequent motion for judgment notwithstanding the verdict.

Ford appeals.

## DISCUSSION

*New Jersey's Statute of Repose for Persons Who Design, Plan, Supervise or Construct Improvements to Real Property Does Not Bar Honer's Claims.*

First, Ford argues, Honer's claims are barred by New Jersey's 10-year statute of repose which provides as follows: "No action, whether in contract,

---

[2] The jury allocated 60 percent of the fault for Honer's damages to subcontractor Charles S. Wood & Co., 10 percent to subcontractor August Arace, 10 percent to general contractor Wigton Abbott and 15 percent to insulation manufacturer Baldwin, Ehret & Hill.

in tort, or otherwise, to recover damages for any deficiency in the design, planning, surveying, supervision or construction of an improvement to real property, or for any injury to property, real or personal, or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained on account of such injury, shall be brought *against any person performing or furnishing the design, planning, surveying, supervision of construction or construction of such improvement to real property*, more than 10 years after the performance or furnishing of such services and construction. This limitation shall serve as a bar to all such actions, both governmental and private, but *shall not apply to actions against any person in actual possession and control as owner, tenant, or otherwise*, of the improvement at the time the defective and unsafe condition of such improvement constitutes the proximate cause of the injury or damage for which the action is brought."[3] (N.J. Stat. § 2A:14-1.1, subd. (a), italics added.)

In a prior appeal, we reversed the trial court's grant of summary judgment in Ford's favor on the basis of this statute. (*Honer v. Ford Motor Company* (Oct. 15, 2007, B189160) [nonpub. opn.].) According to Ford, "The California Supreme Court's recent decision in *McCann v. Foster Wheeler LLC*[, *supra*,] 48 Cal.4th 68, is now controlling on this issue." We disagree.

In *McCann v. Foster Wheeler LLC, supra*, 48 Cal.4th 68, which involved an asbestos-related personal injury action against a boiler manufacturer, our Supreme Court considered the Oklahoma statute of repose applicable to improvements to real property (Okla. Stat. tit. 12, § 109) which provides: " 'No action in tort to recover damages [¶] (i) for any deficiency in the design, planning, supervision or observation of construction or construction of an improvement to real property, [¶] (ii) for injury to property, real or personal, arising out of any such deficiency, or [¶] (iii) for injury to the person or for wrongful death arising out of any such deficiency, [¶] *shall be brought against any person owning, leasing, or in possession of such an improvement or* performing or furnishing the design, planning, supervision or

---

[3] "In *Giest v. Sequoia Ventures, Inc.* (2000) 83 Cal.App.4th 300, 305 [99 Cal.Rptr.2d 476], the court explained the general difference between a statute of limitations and a statute of repose: '[W]hile a statute of limitations normally sets the time within which proceedings must be commenced once a cause of action accrues, [a] statute of repose limits the time within which an action may be brought and is not related to accrual. Indeed, "the injury need not have occurred, much less have been discovered. Unlike an ordinary statute of limitations which begins running upon accrual of the claim, [the] period contained in a statute of repose begins when a special event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted." [Citation.] A statute of repose thus is harsher than a statute of limitations in that it cuts off a right of action after a specified period of time, irrespective of accrual or even notice that a legal right has been invaded. [Citation.]' " (*McCann v. Foster Wheeler LLC* (2010) 48 Cal.4th 68, 78–79, fn. 2 [105 Cal.Rptr.3d 378, 225 P.3d 516].)

observation of construction or construction of such an improvement more than ten (10) years after substantial completion of such an improvement.' " (*McCann v. Foster Wheeler LLC, supra*, 48 Cal.4th at p. 88, fn. 6, italics added [applying a governmental interest analysis, Okla. law found applicable to action against boiler *manufacturer* because Okla.'s interest in protecting businesses from liability held to be stronger than Cal.'s interest in providing a remedy to a Cal. resident injured elsewhere; remanded to determine whether boiler constituted an improvement to real property within the meaning of the Okla. statute].)

By its terms, the Oklahoma statute of repose specifically applies to "any person owning, leasing or in possession" of the improvement to real property (as well as "any person . . . performing or furnishing the design, planning, supervision or observation of construction or construction of such an improvement") while the New Jersey statute of repose on which Ford relies—by its express terms—precludes an action against "any person performing or furnishing the design, planning, surveying, supervision of construction or construction of such improvement to real property, more than 10 years after the performance or furnishing of such services and construction," but, unlike the Oklahoma statute considered in the *McCann* case, the New Jersey statute "shall *not* apply to actions against any person in actual possession and control as owner, tenant, or otherwise, of the improvement . . ." (N.J. Stat. § 2A:14-1.1, subd. (a), italics added).

Although it conceded ownership of the Metuchen, New Jersey, plant at trial, Ford ignores this dispositive language. According to Ford, *O'Connor v. Altus* (1975) 67 N.J. 106, 118–119 [335 A.2d 545], supports its claim the statute of repose should apply to Ford as an "owner-builder." Ford's reliance on this decision is misplaced. In *O'Connor, supra*, 67 N.J. 106, the court determined the category of "owners-builders are within the class which the legislature intended to protect and the statute applies to them. Reason supports the same result. It would be anomalous to say that a general contractor is protected by the statute but that an owner of land who performs some or all of the functions of a general contractor is not entitled to the same protection." (*Id.*, 335 A.2d at p. 552.) Protection is conferred upon this particular class because potential defendants such as an "architect and builder have no control over the owner, whose negligence may be the real cause of dangerous conditions," and "[t]he injured party retains his remedy against the owners after the statutory period." (*Id.* at p. 553; see *id.* at p. 554 [Plaintiffs' "rights remain effective against defendants who might be looked upon as primary—those who own, lease, occupy or control the premises"].) However, there was no evidentiary showing in this case that Ford was such an "owner-builder" within the meaning of the New Jersey statute of repose and

Ford bore the burden of proving entitlement to this affirmative defense. Indeed, to the contrary, it was Ford's position that it had retained contractors and subcontractors to perform the work at the Metuchen plant. Ford has failed to demonstrate error in this regard.

*We Conclude Ford Owed Honer No Duty as a Matter of Law.*

■ "A fundamental element of any cause of action for negligence is the existence of a legal duty of care running from the defendant to the plaintiff." (*Taylor v. Elliott Turbomachinery Co. Inc.* (2009) 171 Cal.App.4th 564, 593 [90 Cal.Rptr.3d 414].) The existence and scope of any such duty are legal questions for the court. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 [110 Cal.Rptr.2d 370, 28 P.3d 116].) " ' " '[D]uty' is not an immutable fact of nature ' "but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection." ' " ' " (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 364 [135 Cal.Rptr.3d 288, 266 P.3d 987], original italics, quoting *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70]; see *Taylor v. Elliott Turbomachinery Co. Inc., supra,* 171 Cal.App.4th at p. 593.)

■ As our Supreme Court explained in *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 [122 Cal.Rptr.3d 313, 248 P.3d 1170] (*Cabral*), "The general rule in California is that '[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . .' (Civ. Code, § 1714, subd. (a).) In other words, 'each person has a duty to use ordinary care and "is liable for injuries caused by his failure to exercise reasonable care in the circumstances . . . ." ' (*Parsons v. Crown Disposal Co.[, supra,*] 15 Cal.4th [at p.] 472 [63 Cal.Rptr.2d 291, 936 P.2d 70], quoting *Rowland v. Christian* [(1968)] 69 Cal.2d [108,] 112 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*).) In the *Rowland* decision, this court identified several considerations that, when balanced together, may justify a departure from the fundamental principle embodied in Civil Code section 1714: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' (*Rowland*, at p. 113; accord, e.g., *Castaneda v. Olsher* [(2007)] 41 Cal.4th [1205,] 1213 [63 Cal.Rptr.3d 99, 162 P.3d 610]; *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1192 [45 Cal.Rptr.3d 316, 137 P.3d 153]; *Merrill v. Navegar, Inc.[, supra*], 26 Cal.4th at p. 477 [110 Cal.Rptr.2d 370,

28 P.3d 116]; *Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at p. 473.) As we have also explained, however, in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where 'clearly supported by public policy.' (*Rowland,* at p. 112; accord, *John B.,* at p. 1191; *Merrill v. Navegar,* at p. 477.)" (*Cabral, supra,* 51 Cal.4th at p. 771, fn. omitted.)

■ As our Supreme Court emphasized in *Cabral,* "Before applying the *Rowland* considerations to the duty question posed here, we note an important feature of the analysis: the *Rowland* factors are evaluated at a relatively broad level of factual generality. Thus, as to foreseeability, we have explained that the court's task in determining duty 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .' " (*Cabral, supra,* 51 Cal.4th at p. 772, citations omitted.)

The *Cabral* court further explained: "In applying the other *Rowland* factors, as well, we have asked not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy. Thus in *Rowland* itself, considering whether the traditional property-law categories of invitee, licensee and trespasser should govern a property owner's duty of care, we observed that while in particular cases the certainty of injury, the burden of exercising due care, or the availability and cost of insurance may be greater as to one class of persons entering real property than as to another, such particular instances 'do not warrant the wholesale immunities resulting from the common law classifications.'[4] (*Rowland, supra,* 69 Cal.2d at p. 119; see also *Knight v. Jewett* (1992) 3 Cal.4th 296, 315–320 [11 Cal.Rptr.2d 2, 834 P.2d 696] [danger of chilling participation in active sports justifies a categorical exception to the duty of ordinary care for participants' careless acts toward coparticipants]; *Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at pp. 474–475 [societal burden of imposing a duty to guard against fright to a horse when properly using a vehicle or machine justifies not recognizing such a duty]; *Castaneda v. Olsher, supra,* 41 Cal.4th at pp. 1216–1217 [declining to recognize a landlord's duty not to rent to gang members in light of the burdens that recognizing such a duty would create].)

"By making exceptions to Civil Code section 1714's general duty of ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, we preserve the crucial distinction between a

---

[4] Accordingly, we need not address the *Privette* line of cases on which Ford relies.

determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make. We explained the distinction as to foreseeability in *Ballard v. Uribe* [(1986)] 41 Cal.3d [564,] 573, footnote 6 [224 Cal.Rptr. 664, 715 P.2d 624]: While the court deciding duty assesses the foreseeability of injury from 'the category of negligent conduct at issue,' if the defendant did owe the plaintiff a duty of ordinary care the jury 'may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place.' An approach that instead focused the duty inquiry on case-specific facts would tend to 'eliminate the role of the jury in negligence cases, transforming the question of whether a defendant breached the duty of care under the facts of a particular case into a legal issue to be decided by the court . . . .' (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 724, fn. 13 [110 Cal.Rptr.2d 528, 28 P.3d 249] [determining the scope of duty of an officer pulling over a vehicle for a moving violation].)" (*Cabral, supra,* 51 Cal.4th at pp. 772–773.)

"[T]he legal decision that an exception to Civil Code section 1714 is warranted, so that the defendant *owed no duty* to the plaintiff, or owed only a limited duty, is to be made on a more general basis suitable to the formulation of a legal rule, in most cases preserving for the jury the fact-specific question of whether or not the defendant acted reasonably under the circumstances." (*Cabral, supra,* 51 Cal.4th at p. 773, fn. omitted.) As *Cabral* noted: "California law accords with the Restatement view. 'No-duty rules are appropriate only when a court can promulgate relatively clear, categorical, bright-line rules of law applicable to a general class of cases.' (Rest.3d Torts, Liability for Physical and Emotional Harm, § 7, com. a, p. 78.)" (*Cabral, supra,* 51 Cal.4th at p. 773, fn. 3.)

In this case, just as in *Cabral*, no question as to the *breach* of the duty of care is presented. The issue of Ford's negligence was submitted to the jury, which found Ford had breached its duty under the particular circumstances shown by the evidence, but assessed Ford's comparative fault as slight, at 5 percent. The factual details—facts which may have been important to the jury's determination of negligence, causation, and comparative fault—are not of central importance to the *duty* question presented here. (*Cabral, supra,* 51 Cal.4th at p. 774.) "To base a duty ruling on the detailed facts of a case risks usurping the jury's proper function of deciding what reasonable prudence dictates under those particular circumstances." (*Ibid.*)

We must determine whether Ford owed Honer a duty of care. Citing *Privette v. Superior Court*[, *supra,*] 5 Cal.4th 689, *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 264–267 [74 Cal.Rptr.2d 878, 955 P.2d

504], *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1240–1241 [108 Cal.Rptr.2d 617, 25 P.3d 1096], *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 [36 Cal.Rptr.3d 495, 123 P.3d 931] and *Laico v. Chevron U.S.A., Inc.* (2004) 123 Cal.App.4th 649 [20 Cal.Rptr.3d 307], Ford says it owed Honer no duty as a matter of law because a "property owner is not responsible for injuries caused by the acts or omissions of an independent contractor unless the property owner controlled the work that allegedly caused the injury, or failed to warn of a known pre-existing concealed hazardous condition on the property." According to Ford, it owed no duty to Honer's father or brother and therefore owed no duty to her. As framed by Honer, "A premises owner who knows or reasonably should know of a condition on the premises, that the owner should foresee exposes persons to an unreasonable risk, and who has no basis for believing that others will discover the condition or realize the risk involved, is under a duty to exercise ordinary care—either to make the condition reasonably safe for others' use or to give a warning adequate to enable others to avoid the harm. (*Williams v. Carl Karcher Enterprises, Inc.* (1986) 182 Cal.App.3d 479, 488 [227 Cal.Rptr. 465]; *Chance v. Lawry's, Inc.* (1962) 58 Cal.2d 368, 373 [24 Cal.Rptr. 209, 374 P.2d 185].) [¶] This is the general duty of care which Ford owed to Eileen Honer, and which it breached by installing asbestos insulation on its premises without taking any precautions against the release of asbestos fibers on its premises."

In our view, the issue before us is whether a premises owner has a duty to protect family members of workers on its premises from secondary exposure to asbestos used during the course of the property owner's business.[5] Our examination of the *Rowland* factors leads us to the conclusion Ford owed Honer no duty of care.

"We examine here the first three related considerations identified in *Rowland*: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, [and] the closeness of the connection between the defendant's conduct and the injury suffered . . . .' " (*Cabral, supra,* 51 Cal.4th at p. 774, quoting *Rowland v. Christian, supra,* 69 Cal.2d at p. 113 (*Rowland*).) Ford acknowledges Honer suffered an asbestos-related injury. "[T]he question of 'the closeness of the connection between the defendant's conduct and the injury suffered' is strongly related to the question of foreseeability itself." (*Cabral, supra,* 51 Cal.4th at p. 779, citation omitted, citing *Rowland, supra,* 69 Cal.2d at p. 113.) "Generally speaking, where the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent

---

[5] The court in *Oddone v. Superior Court* (2009) 179 Cal.App.4th 813, 820 [101 Cal.Rptr.3d 867], observed, "There appears to be no reported California decision addressing the scope of the defendant's duty in a case where the plaintiff claims to have been injured as a result of secondary exposure"—in that case, to certain toxic chemicals used in photo processing.

conduct at issue is likely to be deemed unforeseeable. Conversely, a closely connected type of injury is likely to be deemed foreseeable." (*Cabral, supra,* 51 Cal.4th at p. 779.)

While Honer seeks to hold Ford liable for its management of its premises, it is undisputed Honer never set foot on those premises; rather, she alleged her father and brother brought asbestos dust home on their clothing after working on Ford's property and, more than 50 years later, she was diagnosed with mesothelioma as a result of this exposure. A property owner's duty to maintain its premises in a reasonably safe condition extends to all areas visitors are expressly or impliedly invited to use and over which the owner exercise actual or apparent control, including "areas within a building used in common by patrons of several businesses," "areas outside the building used by the general public in common with business visitors," "areas of ingress and egress visitors are implicitly induced to use;" conversely, a property owner is "not ordinarily liable for injuries that occur on property not in his ownership, possession, or control unless he created the condition or had a right to control activities at the site." (Cal. Tort Guide (Cont.Ed.Bar 3d 2011 Supp.) § 10.13, pp. 493–494, citations omitted.)

In performing the balancing required by *Rowland, supra,* 69 Cal.2d 108, our Supreme Court has emphasized that " 'we have placed major importance on the existence of possession and control as a basis of tortious liability for conditions on the land.' " (*Leakes v. Shamoun* (1986) 187 Cal.App.3d 772, 776 [232 Cal.Rptr. 171], quoting *Preston v. Goldman* (1986) 42 Cal.3d 108, 119 [227 Cal.Rptr. 817, 720 P.2d 476].) "Thus, before liability may be thrust on a landlord for a third party's injury due to a dangerous condition on the land, the plaintiff must show that the landlord had actual knowledge of the dangerous condition in question, *plus the right and ability to cure the condition.*" (*Mata v. Mata* (2003) 105 Cal.App.4th 1121, 1131–1132 [130 Cal.Rptr.2d 141], italics added, citation omitted.) "The *Rowland* factors determine the scope of a duty of care whether the risk of harm is situated on site or off site." (*Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1479 [84 Cal.Rptr.2d 634], citation omitted.)

"The purpose of the plaintiff's presence on the property, while not determinative, must be considered along with other circumstances. (*Ann M. v. Pacific Plaza Shopping Center* [(1993)] 6 Cal.4th 666, 675 [25 Cal.Rptr.2d 137, 863 P.2d 207].) Courts have applied these factors not only to decide whether to depart from Civil Code section 1714 but to define the scope of the landowner's duty. (See, e.g., *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 820 [59 Cal.Rptr.2d 756, 927 P.2d 1260]; *Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th at p. 675, fn. 5.)" (*Laico v. Chevron U.S.A., Inc., supra,* 123 Cal.App.4th 649, 660.) Indeed, in

*Rowland* itself, although our Supreme Court rejected the "rigid classification[]" of a plaintiff's status as a trespasser, licensee, or invitee as "determinative," the plaintiff's status bears on the question of liability because "[t]he proper test to be applied to the liability of a possessor of land in accordance with section 1714 of the Civil Code is whether in the management of his property he has acted as a reasonable man *in view of the probability of injury to others*." (*Rowland, supra,* 69 Cal.2d at p. 119, italics added.)

"[T]his legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct." (*Lugtu v. California Highway Patrol, supra,* 26 Cal.4th 703, 716.) Even if it was foreseeable to Ford that workers on its premises could be exposed to asbestos dust as a result of the work performed on its premises, the "closeness of the connection" between Ford's conduct in having the work performed and the injury suffered *by a worker's family member off the premises* is far more attenuated.[6] The element of a legal duty of care generally acts to limit " ' "the otherwise potentially infinite liability" ' " that would otherwise flow from every negligent act. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745], citations omitted.)

█ "We ask next whether the public policy factors identified in *Rowland*—'the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved' (*Rowland, supra,* 69 Cal.2d at p. 113)—justify creating a duty exception" in this case. (*Cabral, supra,* 51 Cal.4th at p. 781.) "The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible. The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or *by the undesirable consequences of allowing potential liability*." (*Id.* at pp. 781–782, italics added.)

" '[F]oreseeability alone is not sufficient to create an independent tort duty.' (*Erlich v. Menezes* [(1999)] 21 Cal.4th 543, 552 [87 Cal.Rptr.2d 886, 981 P.2d 978]; see also *Bily v. Arthur Young & Co.*[, *supra,*] 3 Cal.4th 370, 399 [11 Cal.Rptr.2d 51, 834 P.2d 745].) Instead, the recognition of a legal duty of care ' "depends upon the foreseeability of the risk and a weighing of policy

---

[6] Although our analysis does not turn on this distinction, we note that in this case, the relationship between Ford's conduct and the injury Honer suffered is even more attenuated inasmuch as Ford hired a general contractor to perform the work, that general contractor hired a subcontractor, that subcontractor hired another subcontractor, and that subcontractor employed Honer's father and brother.

considerations for and against imposition of liability." ' (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) In some cases, when the consequences of a negligent act must be limited to avoid an intolerable burden on society, 'policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk.' (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274 [250 Cal.Rptr. 254, 758 P.2d 582]; see also *Bily v. Arthur Young & Co.*, at p. 398.) 'In short, foreseeability is not synonymous with duty; nor is it a substitute.' (*Erlich v. Menezes*, at p. 552.)" (*O'Neil v. Crane Co., supra*, 53 Cal.4th at p. 364.)

Here, even assuming a property owner can reasonably be expected to foresee the risk of latent disease to a worker's family members secondarily exposed to asbestos used on its premises, we must conclude strong public policy considerations counsel against imposing a duty of care on property owners for such secondary exposure. (See *O'Neil v. Crane Co., supra*, 53 Cal.4th at pp. 364–365 ["strong policy considerations counsel against imposing a duty of care on pump and valve manufacturers to prevent asbestos-related disease"].) The *Rowland* factors do not support a finding of duty in this case.

■ "To avoid redundancy with the other *Rowland* factors, the moral blame that attends ordinary negligence is generally not sufficient to tip the balance of the *Rowland* factors in favor of liability," and courts require a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result, (2) had actual or constructive knowledge of the harmful consequences of their behavior, (3) acted in bad faith or with a reckless indifference to the results of their conduct, or (4) engaged in inherently harmful acts. (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 270 [80 Cal.Rptr.2d 196], citations omitted.)

The next two *Rowland* factors—the extent of the burden to the defendant and the consequences to the community if the court imposes on a particular defendant a duty of care toward the plaintiff—weigh heavily against Honer. As explained in *Oddone v. Superior Court, supra*, 179 Cal.App.4th 813, 822 in a closely related context, the "principal difficulty with these factors is that it is hard to draw the line between those nonemployee persons to whom a duty is owed and those nonemployee persons to whom no duty is owed. Including 'all family members' into the former category would be too broad, as not all family members will be in constant and personal contact with the employee. Limiting the class to spouses would be at once too narrow and too broad, as others may be in contact with the employee and spouses may not invariably be in contact with the employee. Limiting the class to those persons who have frequent and personal contact with employees leaves at large the question what 'frequent' and 'personal' really means. This is only a sampling

of the problem." Moreover, in a case such as Honer's, where the claim is that the laundering of the worker's clothing is the primary source of asbestos exposure, the class of secondarily exposed potential plaintiffs is far greater, including fellow commuters, those performing laundry services and more.

"The gist of the matter is that imposing a duty toward nonemployee persons saddles the defendant employer with a burden of uncertain but potentially very large scope. One of the consequences to the community of such an extension is the cost of insuring against liability of unknown but potentially massive dimension. Ultimately, such costs are borne by the consumer. In short, the burden on the defendant is substantial and the costs to the community may be considerable. [¶] Assuming for the purposes of argument that there is some risk to nonemployee persons, in a less than perfect world it appears to make more sense to look to the nonemployee person's insurance to cover the risk. In the normal course of events, such insurance will be already in place and its cost is not likely to be influenced by the risk created by the employer's conduct." (*Oddone v. Superior Court, supra*, 179 Cal.App.4th at pp. 822–823.)

"Asbestos is subject to strict regulation under both federal and California law. (See *U.S. v. Weintraub* (2d Cir. 2001) 273 F.3d 139, 149–150 [partial listing of federal asbestos regulations]; see also Health & Saf. Code, § 25915 et seq. [notification requirements concerning presence of asbestos in buildings constructed after 1979]; Lab. Code, § 6501.9 [requiring determination of presence of asbestos before asbestos-related construction work is done]; Cal. Code Regs., tit. 8, § 1529 [regulation of asbestos in construction work].)" (*Taylor v. Elliott Turbomachinery Co. Inc., supra*, 171 Cal.App.4th 564, 595, fn. 14.)

In California, "[F]oreseeability *and extent of burden to the defendant . . .* have evolved to become the primary [*Rowland*] factors" to be considered on the question of legal duty. (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 280, fn. 5 [12 Cal.Rptr.3d 846], italics added; see *Castaneda v. Olsher, supra*, 41 Cal.4th 1205, 1213 ["Foreseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other *Rowland* factors may be determinative of the duty analysis."].)

We note that, in recent years, a number of other jurisdictions have confronted the issue of liability in secondary or "take-home" exposure cases, and their rulings are generally split into two categories: (1) those focusing on the foreseeability of the harm to the plaintiff resulting from the premises owner's or employer's failure to take protective measures (and finding a duty) and (2) those that focus on the (absence of a) relationship between the premises owner/employer and household member among other policy concerns. (See Levine, *Clearing the Air: Ordinary Negligence in Take-Home*

*Asbestos Exposure Litigation* (2011) 86 Wash. L.Rev. 359, 377–382, and citations therein.) For "injuries to workers' family members who have been exposed to asbestos off-site, typically through contact with a directly exposed worker or that worker's soiled work clothes," "[t]he courts that have rejected a new duty rule for premises owners have recognized that tort law must draw a line between the competing policy considerations of providing a remedy to everyone who is injured and of extending tort liability almost without limit." (Landin et al., *Lessons Learned from the Front Lines: A Trial Court Checklist for Promoting Order and Sound Policy in Asbestos Litigation* (2008) 16 J.L. & Pol'y 589, 624, 626.)

For example, in *Miller v. Ford Motor Co. (In re Certified Question)* (2007) 479 Mich. 498, 521 [740 N.W.2d 206, 220], the Michigan Supreme Court concluded that "imposing a duty on a landowner to anybody who comes into contact with somebody who has been on the landowner's property" (and secondarily exposed to asbestos as a result) " 'would create a potentially limitless pool of plaintiffs.' " (*Ibid.*; see *id.* at p. 518 ["Because the ultimate inquiry in determining whether a duty should be imposed involves balancing the social benefits of imposing a duty with the social costs of imposing a duty, we cannot decide whether a duty should be imposed without 'assessing the competing policy considerations . . . .' "]; see also *CSX Transportation, Inc. v. Williams* (2005) 278 Ga. 888, 890, 892 [608 S.E.2d 208, 209, 210] ["Georgia negligence law does not impose any duty on an employer to a third-party, non-employee, who comes into contact with its employee's asbestos-tainted work clothing at locations away from the workplace"; " 'in fixing the bounds of duty, not only logic and science, but policy play an important role . . .' [citation]" and "there is a responsibility to consider the larger social consequences of the notion of duty . . . ."]; and see *Musselman v. Amphenol Corp.* (E.D.Pa., No. 2:10-CV-69486-ER, Nov. 28, 2011) 2011 U.S. Dist. LEXIS 150100, pp. *10–*11 [2011 WL 6415165] [noting split of authority regarding employer's and/or premises owner's duty in "take-home" asbestos exposure cases and listing cases with designation of "duty" or "no duty" determination].)

■ In sum, after considering the *Rowland* factors, as further clarified in *Cabral*, we conclude that a property owner has no duty to protect family members of workers on its premises from secondary exposure to asbestos used during the course of the property owner's business. While the overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible, the policy question is "whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or *by the undesirable consequences of allowing potential liability*." (*Cabral, supra,* 51 Cal.4th at pp. 781–782, italics added.) It follows that Ford owed no duty to Honer.

## *DISPOSITION*

The judgment is reversed. Each party is to bear its own costs of appeal.

Perluss, P. J., and Zelon, J., concurred.

A petition for a rehearing was denied June 19, 2012, and the opinion was modified to read as printed above.