[No. B213784. Second Dist., Div. Eight. Nov. 24, 2009.]

GERALDINE ODDONE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TECHNICOLOR, INC., Real Party in Interest.

**COUNSEL**

Gonzalez & Robinson, Joseph D. Gonzalez and Keith A. Robinson for Petitioner.

No appearance for Respondent.

Mitchell Silberberg & Knupp, Hayward J. Kaiser and Paul Guelpa for Real Party in Interest.

**OPINION**

**FLIER, Acting P. J.**—James Oddone worked for real party in interest Technicolor, Inc. (Technicolor), from 1973 until 2006; he died from a brain tumor (glioblastoma multiforme) in January 2007. His widow, petitioner Geraldine Oddone (hereafter petitioner), filed an action against Technicolor in 2008, in substance on the theory that her husband's brain tumor was caused by exposure to toxic chemicals while her husband was working for Technicolor.

Petitioner alleged three causes of action against Technicolor. Only the third cause of action is at issue in these proceedings.[1] This cause of action is

---

[1] The operative pleading is the first amended complaint.

asserted by petitioner solely on her own behalf on the theory that her husband brought home toxic vapors and chemicals on his clothing and person and that petitioner was injured by exposure to these materials; this cause of action is predicated on Technicolor's alleged negligence in exposing petitioner's husband to toxic chemicals.

The trial court sustained Technicolor's demurrer to the third cause of action without leave to amend on the ground that Technicolor did not owe a duty of due care to petitioner. We issued an order to show cause, received further briefing and heard oral argument. We conclude that Technicolor does not owe petitioner a duty of due care. Accordingly, we deny the petition.

## FACTS

The pertinent facts are set forth in the complaint.[2] Technicolor was in the business of processing motion picture film and "used certain chemical substances (hereinafter collectively and singularly referred to as 'the chemical substances') which were of a toxic nature. . . . The chemical substances used by Defendant Technicolor include but are not limited to: formaldehyde, perchloroethylene, trichloroethylene, and acetone. Both formaldehyde and perchloroethylene are known to cause cancer." James Oddone was continually exposed "to the chemical substances" while at work. As a proximate cause of being continuously exposed "to the chemical substances," James Oddone developed glioblastoma multiforme and died of that disease in January 2007.

Technicolor knew that the solution of formaldehyde and perchloroethylene "mixed in equal parts in the wet gate printing area to wet film during printing, evaporates into the room and that the solvent's vapors linger in their employees' breathing zone." Throughout his employment, James suffered from dermatitis and rashes that were caused by the toxic chemicals used by Technicolor but the only remedy that Technicolor made available was cortisone cream. Technicolor knew that James's injuries were caused by toxic chemicals, but it failed to inform James of this fact and failed to take any measures to cure or prevent James's injuries caused by toxic chemicals.

Petitioner made two attempts to state a cause of action for her own alleged injuries.

The original complaint alleged that, while he was at work, James's "clothing would absorb some of the chemical substances he was using as part

---

[2] "[A] demurrer admits the truth of all allegations which are well pleaded, however improbable the facts may be." (*Lee v. Hensley* (1951) 103 Cal.App.2d 697, 704 [230 P.2d 159].)

of his employment and would also remain on his skin. [Petitioner] was exposed to these toxic substances as a result of her contact with her husband when he came home from work." After alleging that Technicolor had a duty to safely operate its premises, the complaint alleged that this duty "included protecting the spouses and family members of employees from coming into contact with the chemical substances used at the Technicolor facility." This complaint also alleged that Technicolor had a duty to warn James of the dangerous condition on its premises, that Technicolor failed to do so and that this "failure to warn caused James Oddone to return home after work with chemicals on his body and clothing, thereby causing his wife, [petitioner], to suffer secondary chemical exposure when [petitioner] slept next to her husband at night, washed James Oddone's work clothes, and was intimate with James Oddone."

Technicolor demurred to these allegations on the ground that it did not owe a duty of due care to petitioner. The court sustained this demurrer "on the ground there is no duty." The court gave petitioner leave to amend her complaint since it also sustained demurrers to the other causes of action, in part on the ground that the complaint was uncertain.

The first amended complaint alleges in an introductory paragraph that "[petitioner] alleges on information and belief that defendants, and each of them, knew or should have known that workers would carry these toxic chemical substances home with them and expose the workers' family members and as such defendants, and each of them, created an unreasonable risk of harm to [petitioner]." The third cause of action, which states petitioner's own claim, alleges that Technicolor had a "direct duty to [petitioner] not to allow clothing or people which are contaminated with toxic chemical substances to leave [Technicolor's] places of business under circumstances where it is reasonable that family members will come into contact with the toxic chemical substances. [¶] [Petitioner] is informed and believes and thereon alleges that as a direct and proximate result of the aforesaid negligence and carelessness of Defendant Technicolor, [petitioner] was caused to and did become exposed to toxic vapors and chemicals, and as a direct result, suffered injuries and damage to her person."

The court sustained Technicolor's demurrer to the foregoing cause of action without leave to amend.

## DISCUSSION

1. Bily v. Arthur Young & Co. *(1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745]*

Technicolor supports, of course, the trial court's conclusion that it owed no duty to petitioner. Technicolor predicates its analysis of the duty issue on six factors identified in *Bily v. Arthur Young & Co., supra*, 3 Cal.4th 370, 397–398 (*Bily*). These factors are: the extent to which the transaction was intended to affect the plaintiff; the foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the injury suffered; the moral blame attached to the defendant's conduct; and the policy of preventing future harm. (*Ibid.*) Petitioner appears to agree that *Bily* represents at least an appropriate starting point for analysis.

We do not agree with the proposition that *Bily* sets forth the appropriate analytical framework for the case before us.

In *Bily*, the accountancy firm of Arthur Young & Co. had prepared financial statements for the Osborne Computer Corporation. The plaintiffs in the action against Arthur Young & Co. were investors in the Osborne Computer Corporation and their claim was that the financial statements prepared by Arthur Young & Co. were seriously in error, that the plaintiffs had relied on those statements and that, as a result, they had sustained substantial economic harm. The contract under which Arthur Young & Co. had prepared the financial statements was with the Osborne Computer Company; the plaintiffs in *Bily* were not parties to that contract.

Significantly, the court introduced the checklist of the aforesaid factors with the statement that "[w]e have employed a checklist of factors to consider in assessing legal duty in the absence of privity of contract between a plaintiff and a defendant." (*Bily, supra*, 3 Cal.4th at p. 397.) This statement, and the underlying facts of *Bily*, demonstrate that there are three reasons why this decision is not the appropriate starting point for analyzing the issue before us.

First. The first of these factors, i.e., the extent to which the *transaction* was *intended* to *affect* the plaintiff, makes sense in the context of the facts of *Bily*, but it makes no sense in a case like the one before us. In this case, Technicolor, if it was negligent, harbored no intent to affect anyone nor, of course, are we dealing in this case with a "transaction" that would "affect" anyone. It is evident that this factor in *Bily* envisages *the performance of services to a client or patron* and a plaintiff who is someone other than the client or patron; it is in this setting that one can speak of a "transaction" that was intended to "affect" someone, the "transaction" being the service that was performed.

■ Second. The duty of the defendant in *Bily* was to act in conformance with professional standards and that duty was owed, in the first place, to the defendant's client. This case poses the question whether the *scope* of Technicolor's duty includes petitioner, i.e., whether, in another formulation of the issue, petitioner is a foreseeable plaintiff. It is true that, from a broad conceptual perspective, factual settings such as found in *Bily* are also cases about the scope of the defendant's duty. But cases involving the rendition of professional or business services involve considerations that are unique to such cases,[3] and they are therefore dealt with in a class by themselves. (See generally 3 Harper et al., Torts, *supra*, § 18.5A, pp. 845–853.) Cases arising in this specialized setting are not necessarily instructive in settings outside of this context.

■ Third. When it comes to the scope of duty, i.e., to whether the plaintiff is foreseeable, there appears to be a difference between cases when the negligent act results in physical injury and cases when negligence results in economic loss. "The expectation that an actor will be subject to liability for harm caused by mere negligence is greatest where the negligence results in physical injury." (3 Harper et al., Torts, *supra*, § 18.5A, p. 846.) On the other hand, liability tends to be more limited when the loss is economic. (*Ibid.*)

In sum, *Bily* is a decision in a specialized context when the scope of duty analysis is influenced by considerations that are absent outside this context. In our view, *Rowland v. Christian* (1968) 69 Cal.2d 108, 112–113 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*), and its familiar factors, which we set forth in the margin,[4] is the appropriate starting point for analysis.

---

[3] An example of one such consideration is that the ground rule is that a lawyer is subject to liability in negligence only to the client or to "one or more persons of a restricted class for whose specific benefit or on whose specific behalf the lawyer was retained by the client." (3 Harper et al., Torts (3d ed. 2007) § 18.5A, pp. 845–846.) There is no comparable specific limitation on liability in a case such as the one before us.

[4] "A departure from this fundamental principle [everyone is responsible for an injury caused another by the want of ordinary care] involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland, supra*, 69 Cal.2d at pp. 112–113.)

## 2. *Petitioner's Attempts to State a Cause of Action Fall Short of the* Rowland *Criteria*

■ Petitioner's attempts to state a cause of action for her own alleged injuries fall strikingly short when it comes to the third of the *Rowland* factors, which is the closeness of the connection between the defendant's conduct and the injury suffered.

There appears to be no reported California decision addressing the scope of the defendant's duty in a case where the plaintiff claims to have been injured as a result of secondary exposure to chemicals. There is, however, a decision that provides standards by which the allegations of a complaint can be measured when the plaintiff seeks to recover for injuries allegedly caused by his or her primary exposure to allegedly toxic chemicals. This decision is *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71 [86 Cal.Rptr.2d 846, 980 P.2d 398] (*Bockrath*) in which the deceased plaintiff contracted multiple myeloma, a form of cancer. He claimed to have contracted this disease while working for Hughes Aircraft Company from 1973 to 1994. (*Id.* at p. 77.)

The plaintiff in *Bockrath* claimed that his cancer was caused by exposure to chemicals and chemical ingredients that had carcinogenic effects. The complaint described how these unspecified chemicals acted on the plaintiff's body.[5] The aspect of *Bockrath* that is significant in the case before us is that the plaintiff in that case failed to identify the specific toxic chemicals that caused a specific illness or illnesses.

The *Bockrath* court concluded that the plaintiff would have to "allege that he was exposed to each of the toxic materials claimed to have caused a specific illness. An allegation that he was exposed to 'most and perhaps all' of the substances listed is inadequate." (*Bockrath, supra,* 21 Cal.4th at p. 80.) In doing so, the plaintiff "must identify each product that allegedly caused the injury. It is insufficient to allege that the toxins in defendants' products caused it." (*Ibid.*) The plaintiff would have to allege that the toxin entered his

---

[5] After alleging that he was exposed to unspecified chemicals, "[p]laintiff continued: 'Upon reaching the internal organs of Plaintiff's body, including but not limited to the liver and spleen, the foregoing chemicals and chemical products were transformed by metabolic processes, resulting in the formation of toxic metabolites, free radicals, and residual unmetabolized product, by various complex biological mechanisms . . . . [¶] . . . Upon being so metabolized, residual unreacted product, toxic metabolites, free radicals and other chemicals resulting from metabolic processes migrated to the bone marrow, where such products, byproducts, and toxic metabolites caused hemotoxic, hematotoxic, immunotoxic, genotoxic and carcinogenic injuries to the blood and blood forming organs within Plaintiff's bones, thereby initiating and/or promoting the development of Plaintiff's multiple myeloma and other related and consequential injuries, which will be further established and clarified according to proof at the time of trial.' " (*Bockrath, supra,* 21 Cal.4th at p. 77.)

body as a result of the exposure. Finally, he would have to allege that his specific illness was caused by a specified toxin. (*Ibid.*)

■ The lesson from the foregoing is that a plaintiff claiming to have been injured by an exposure to chemicals must specify the chemical that caused the injury and in the course of doing so must of course also specify the injury. Importantly, he must also allege that as a result of the exposure the specified toxin entered his body.

We do not think that it makes a difference that the plaintiff is claiming injury as a result of secondary exposure. If anything, the foregoing requirements are even more apropos in such a case because the connection between the defendant's acts and the claimed injury is more attenuated than in a primary exposure case.

It cannot be denied that a case predicated on secondary exposure to chemicals potentially cuts a very wide swath. It is therefore only appropriate to pay close attention to the *Rowland* factor that there must be a close connection between the defendant's conduct and the injury suffered. That connection is only shown by setting forth specifically which chemicals cause which specified injuries. In a secondary exposure case, the allegation that as a result of the exposure the specified chemical entered the plaintiff's body is of particular importance. Central issues in such a case are whether *secondary exposure* to a specified chemical is even possible and, if it is, whether the exposure will result in the ingestion of the chemical into the plaintiff's body.

■ Although in *Bockrath* the plaintiff had named multiple defendants, which is not true of the case before us, the court's policy concerns nonetheless apply to this case as well: "[C]oncern about overbroad litigation is wholly understandable. The law cannot tolerate lawsuits by prospecting plaintiffs who sue multiple defendants on speculation that their products may have caused harm over time through exposure to toxins in them, and who thereafter try to learn through discovery whether their speculation was well-founded." (*Bockrath, supra*, 21 Cal.4th at p. 81.)

■ Measured against the foregoing standards, petitioner's attempts to state a cause of action for her own injuries are palpably inadequate. While there is at least a gesture toward specificity in stating James Oddone's claim, there is not even an attempt in this direction when it comes to petitioner's claim. Petitioner fails to identify or specify even one chemical and she signally fails to specify any one of her alleged injuries. It follows of course that she fails to connect any specified chemical or chemicals to a specific injury or injuries.

Petitioner's second attempt discloses her inability to state facts sufficient to constitute a cause of action. In her second attempt, she alleged on information

and belief that defendants know or should have known that employees would carry "these toxic chemical substances home with them" and that the defendants had a duty not to "allow clothing or people which are contaminated with toxic chemical substances" to leave the premises. The only mention of injury was that petitioner "suffered injuries and damage to her person."

We do not hold that a plaintiff cannot state a cause of action for secondary exposure to toxic chemicals. Given appropriately specific allegations, this may be quite possible. But in this case, petitioner's allegations simply do not establish any connection, much less a close connection, between the defendant's conduct and her alleged (and unspecified) injuries.

It follows from the foregoing that the first and second *Rowland* factors are not met by the allegations of this complaint. Given that there is no indication which specific chemicals cause which specified injuries, one cannot even ask the question whether the harm to the plaintiff was foreseeable; for one, we do not know what the harm is or was. For the identical reason, we cannot inquire whether it was certain that the plaintiff was injured; we do not know her injuries.

The next two *Rowland* factors also weigh heavily against petitioner. These factors are the extent of the burden to the defendant and the consequences to the community if the court imposes on the particular defendant a duty of due care toward the plaintiff.

Petitioner's principal difficulty with these factors is that it is hard to draw the line between those nonemployee persons to whom a duty is owed and those nonemployee persons to whom no duty is owed. Including "all family members" into the former category would be too broad, as not all family members will be in constant and personal contact with the employee. Limiting the class to spouses would be at once too narrow and too broad, as others may be in contact with the employee and spouses may not invariably be in contact with the employee. Limiting the class to those persons who have frequent and personal contact with employees leaves at large the question what "frequent" and "personal" really means. This is only a sampling of the problem.

The gist of the matter is that imposing a duty toward nonemployee persons saddles the defendant employer with a burden of uncertain but potentially very large scope. One of the consequences to the community of such an extension is the cost of insuring against liability of unknown but potentially massive dimension. Ultimately, such costs are borne by the consumer. In short, the burden on the defendant is substantial and the costs to the community may be considerable.

Assuming for the purposes of argument that there is some risk to nonemployee persons, in a less than perfect world it appears to make more sense to look to the nonemployee person's insurance to cover the risk. In the normal course of events, such insurance will be already in place and its cost is not likely to be influenced by the risk created by the employer's conduct.

Finally, if we are to assume that Technicolor's conduct has in fact caused petitioner personal injury, there is little doubt that the moral blame attached to that conduct is substantial. Thus, not all of the *Rowland* factors militate in Technicolor's favor.

On balance, however, we conclude that, given the allegations of this complaint, we cannot say that Technicolor had a duty to petitioner. We therefore agree with the trial court that the demurrer had to be sustained.

### 3. *It Was Correct to Sustain the Demurrer Without Leave to Amend*

The question is whether the trial court should have afforded petitioner a third opportunity to state a cause of action for her own injuries. "When a demurrer is sustained to a complaint it is within the discretion of the court either to allow an amended complaint to be filed or to give judgment forthwith in favor of the defendant. The appellate court will in every such case sustain the action of the court below, whatever course it may take, unless it is made to appear by the record that there has been an abuse of discretion." (*Stewart v. Douglass* (1906) 148 Cal. 511, 512 [83 P. 699].) "A general demurrer may be sustained without leave to amend where it is probable from the nature of the defects and previous unsuccessful attempts to plead that the plaintiff cannot state a cause of action." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 992, p. 403.)

We cannot say that the trial court abused its discretion in sustaining the demurrer to the first amended complaint without leave to amend. Petitioner's second attempt to plead a cause of action for her own injuries was, if anything, weaker than her first effort in that it omitted the allegation that clothing would absorb the chemical substances used in Technicolor's facilities, as well as the allegation that these chemicals would be carried home on the employee's skin. As petitioner's second attempt was notably weaker than her first try, the trial court was justified in concluding that no useful purpose would be served by yet another attempt.

### 4. *Petitioner's Reply Brief*

Petitioner states in her reply brief that she suffers from dermatitis "as a result of exposure to chemicals that her husband brought home from Technicolor." She offers this in support of her claim that there is a close connection between Technicolor's conduct and the injury she has suffered.

There are three flaws in this contention. First, neither the original nor the first amended complaint alleged that petitioner suffers from dermatitis caused by chemicals used by Technicolor. The trial court based its ruling on the allegations of the pleadings and that is the ruling that we are required to review. Second, it remains true that petitioner has not identified the chemical that has caused the dermatitis. Third, given that the chemical is unidentified, there is no allegation how exposure to this chemical caused petitioner's body to absorb it.

Finally, both sides refer us to out-of-state authorities. We see no reason to consider them.

In sum, we conclude that Technicolor does not owe a duty of due care to petitioner.

## DISPOSITION

The alternative writ is discharged and the petition is denied. Technicolor is to recover costs in these proceedings.

Bigelow, J., and Bendix, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.