Sanford CLAIR, Plaintiff,

Ruth Nishida, Alison Tucker and Nicholas White, Individually and as Representative of the Estate of Mark White, Deceased, Appellants,

v.

MONSANTO COMPANY, Defendant,

and

Pharmacia Corporation, Respondent.

No. ED 99246.

Missouri Court of Appeals,
Eastern District,
Division Three.

July 23, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 22, 2013.

Application for Transfer Denied Nov. 26, 2013.

John G. Simon, St. Louis, MO, Steve Jensen, Dallas, TX, for Appellant.

Mark G. Arnold, Thomas M. Carney, Carol A. Rutter, Adam E. Miller, Clayton, MO, David M. Axelrad, Dean M. Bochner, Encino, CA, for Respondent.

Mark I. Bronson, St. Louis, MO, Brent M. Rosenthal, Dallas, TX, for Amici Curiae.

ROBERT G. DOWD, JR., Presiding Judge.

Ruth Nishida, Alison Tucker, and Nicholas White, Individually and as Representatives of the Estate of Mark White ("Plaintiffs"), appeal from the trial court's grant of summary judgment in favor of Pharmacia Corporation ("Pharmacia"). Plaintiffs contend the trial court erred in granting summary judgment with respect to Plaintiffs' cause of action brought under California law for design defect because: (1) the post-use disposal of polychlorinated biphenyls ("PCBs") was foreseeable; and (2) the foreseeable and intended uses of Pharmacia's "open use" PCBs resulted in releases into the environment, which, in turn, resulted in an increase in Plaintiffs' risk of developing Non–Hodgkin's Lymphoma. Plaintiffs further contend the trial court erred in granting summary judgment with respect to negligence because Plaintiffs established Pharmacia owed a duty of reasonable care. We reverse and remand.

Plaintiffs are either California residents who developed lymphohematopietic cancer or the survivors of California residents who died after developing lymphohematopietic cancer. Plaintiffs allege their exposure to PCBs designed, manufactured, and distributed by the original Monsanto Company[1] ("Old Monsanto") was a substantial factor in the cause of their cancer.

---

1. Old Monsanto has ceased to exist as a corporate entity. In 1997, its chemical division was split off and reformed into a newly-independent corporation, which was renamed Solutia, Inc. ("Solutia"). In 2000, the remaining portion of Old Monsanto merged with Pharmacia, which meant Old Monsanto no longer existed as a separate corporate entity. Pharmacia then incorporated a new company called Monsanto Company ("New Monsan-

From 1901 to 1997, Old Monsanto manufactured a variety of chemical and agricultural products, including PCBs. PCBs are a class of 209 discrete chemical compounds called congeners in which one to ten chlorine atoms are attached to biphenyl. Old Monsanto made more than 99 percent of all the PCBs that were ever manufactured and sold in the United States.[2] There are no known natural sources of PCBs in the environment.

PCBs were designed to be resilient to heat and chemical breakdown. As a result of this resilience, PCBs are commonly found in the environment to this day, even though their manufacture and sale in the United State was banned over thirty years ago. Some PCBs entered the environment because they were incorporated into "open use" products, such as paints, varnishes, adhesives, hydraulic fluids, and carbonless copy paper. These "open use" products allow for the release of PCBs during the use of the PCB-containing products themselves. Other PCBs entered the environment as waste following disposal of manufacturing by-products and end-use products that contained PCBs.

According to the affidavit of Plaintiffs' expert, Dr. David Rosner, Pharmacia knew as early as 1938 that PCBs were systemically toxic and could cause acute toxicity problems, given sufficient exposure. In the 1940s, DDT, a similar chemical, was first detected in animal tissue. In 1966, using new technology, scientists discovered PCBs in animal tissue in Sweden. Subsequently, PCBs were found in birds in the United States in 1968. Before these discoveries, Pharmacia made no effort to test for PCBs in the environment or to determine the long-term health effects of PCBs. In 1970–71, Pharmacia ceased the use of PCBs in "open use" products. The manufacture and importation of PCBs as well as the production and repair of PCB transformers were banned in 1979. Some PCBs that were manufactured prior to 1979 are still in use in transformers today. However, the current danger from PCBs comes from their presence in the environment. Dr. Rosner testified, based on his review of internal Pharmacia documents, Pharmacia had actual knowledge many of its PCBs would be released into the environment by third parties. Dr. Rosner cited to one document from 1969, after it was known the PCBs were accumulating in the environment, where Pharmacia noted "[i]t has been recognized from the beginning that other functional fluid uses could lead to losses of [PCBs] to liquid waste streams from the customers' plants. Losses could occur from spills, from unusual leakage of large volumes and daily losses of smaller volumes." Dr. Rosner further opined Pharmacia should have been aware that standard industrial waste disposal practices from the 1930s to the 1960s resulted in huge quantities of PCBs being released into the environment as waste.

Plaintiffs allege analyses of their blood showed each had elevated levels of several different PCBs in their blood. Pharmacia's expert, Dr. Terry Troxell, testified he knew "with a certainty that [Pharmacia's] PCBs are in the American food supply." In addition, Dr. Troxell testified he knew

---

to"). Pharmacia subsequently spun off its interest in New Monsanto, which now operates as an independent corporate entity. Pharmacia subsequently became a wholly owned subsidiary of Pfizer, Inc. ("Pfizer"), but remains a separate and distinct corporation.

**2.** Pharmacia represents what remains of Old Monsanto, the alleged original tortfeasor. Pharmacia is also the only remaining defendant. Therefore, for the rest of this opinion, we will refer to the conduct of Pharmacia, which is synonymous with Old Monsanto for the purposes of this appeal.

with certainty that all Plaintiffs "have [Pharmacia's] PCBs in their bodies" or had them in their bodies before they died. Studies have linked elevated PCB levels with an increased risk of developing Non–Hodgkin's Lymphoma.

As a result, Plaintiffs filed suit against New Monsanto, Solutia, Pharmacia, and Pfizer (collectively "Defendants") alleging strict liability for design defect and negligence.

After this suit was initiated and Defendants filed answers and affirmatives defenses, the trial court dismissed New Monsanto, Solutia, and Pfizer from the case without prejudice, but allowed Plaintiffs to proceed against Pharmacia. Thus, as noted above, Pharmacia is the only remaining defendant in this litigation.

In their negligence claim, Plaintiffs allege Defendants were negligent in marketing and distributing various PCB products when they were aware or should have been aware of the hazards of PCBs and either knew or should have known the PCBs would be released into the environment. In their strict liability claim, Plaintiffs allege the PCBs were defectively designed because as a result of the foreseeable dumping of those PCBs and PCB-containing products and also the incorporation of PCBs into "open-use" products, the PCBs made their way into the environment and into the food chain. Plaintiffs contend as a result of Defendants' negligence and the defective design, they were exposed to PCBs, which was a substantial factor in the development of their cancer. Plaintiffs also assert their claims are governed by California law because their cancer developed while they were living in California. Plaintiffs seek compensatory and punitive damages.

Pharmacia subsequently filed a motion for summary judgment. Pharmacia argues, with respect to the negligence claim, it had no duty to protect Plaintiffs from the conduct of downstream users of PCBs or from injuries related to the presence of PCBs in the environment. With regard to the strict liability claim, Pharmacia asserted: (1) Plaintiffs cannot prove they were harmed as a result of an intended or foreseeable use of the product; (2) Plaintiffs have no evidence as to what PCBs they were exposed to, and therefore, the risk versus benefit analysis to determine whether the product was defective cannot be applied, and; (3) if the court determines there is no duty in negligence, then there is no duty in strict liability.

The trial court entered its judgment granting summary judgment in favor of Pharmacia. The trial court set out the undisputed facts in its judgment. The trial court found Pharmacia defined its category of conduct as the duty to protect Plaintiffs from the conduct of downstream users of PCBs and/or injuries caused by the presence of PCBs in the environment. The trial court also found because Plaintiffs could not specify when the PCBs in their blood were manufactured or what path they took from manufacturer to each Plaintiff, holding Pharmacia owed them a duty would mean Pharmacia was an insurer of its products for all places, times, and conditions. Thus, the trial court found public policy supported a finding of an exemption to the general duty rule for this category of conduct. In addition, the court noted the connection between Pharmacia's conduct and Plaintiffs' injuries was not sufficiently close to weigh strongly in favor of imposing a legal duty on Pharmacia, and Pharmacia could not reasonably foresee its conduct would harm Plaintiffs. Further, the trial court noted the excessive burden imposing a duty would create for Pharmacia, which would be forced to defend against a potentially "limitless pool of plaintiffs," weighed against the imposition

of such a duty. Lastly, the trial court noted nothing the trial court did could prevent or mitigate future injuries because the PCBs were already in the environment. Thus, the trial court found as a matter of law that Pharmacia owed no duty to Plaintiffs and granted Pharmacia's motion for summary judgment on the negligence claim.

As for the strict liability design defect claim, the trial court found, as a matter of law, Pharmacia cannot be held strictly liable to Plaintiffs for injuries caused by PCBs in the environment resulting from the unforeseeable and unintended uses of dumping, disposal, scrapping, recycling, incineration, and destruction of PCBs and PCB-containing products by third parties. Thus, after finding Plaintiffs had not and would not be able to produce evidence sufficient to allow the trier of fact to find intended and foreseeable uses of PCBs were a substantial factor in causing their injuries, the trial court granted summary judgment against Plaintiffs on their strict liability claim.

Plaintiffs subsequently filed a motion for new trial, which was denied by operation of law. This appeal follows.

■ A forum state will always apply forum procedure. *Moore ex rel. Moore v. Bi–State Development Agency,* 87 S.W.3d 279, 285 (Mo.App. E.D.2002). Thus, Missouri procedural law applies to the issues raised on appeal. *Id.* The standard of review is a procedural issue, and therefore Missouri law governs the standard of review for the issues raised on appeal. *Id.*

■ The propriety of summary judgment is purely an issue of law. *Meramec Valley R–III School Dist. v. City of Eureka,* 281 S.W.3d 827, 835 (Mo.App. E.D. 2009). Accordingly, the standard of review on appeal regarding summary judgment is no different from that which should be employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* Summary judgment is designed to permit the trial court to enter judgment, without delay, where the moving party has demonstrated its right to judgment as a matter of law. *Id.*

Our review of the grant of summary judgment is *de novo.* *Id.* Summary judgment is upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Meramec Valley R–III School Dist.,* 281 S.W.3d at 835. Facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* A defending party may establish a right to judgment as a matter of law by showing any one of the following: (1) facts that negate any one of the elements of the claimant's cause of action; (2) the non-movant, after an adequate period of discovery, has not and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *Id.* Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *Id.* The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial. *Id.* "Genuine"

implies that the issue, or dispute, must be a real and substantial one—one consisting not merely of conjecture, theory and possibilities. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 378 (Mo. banc 1993). A "genuine issue" is a dispute that is real, not merely argumentative, imaginary or frivolous. *Id.* at 382. Where the "genuine issues" raised by the non-movant are merely argumentative, imaginary or frivolous, summary judgment is proper. *Id.*

■ With regard to substantive law, a forum state will choose the applicable substantive law according to its own conflict of law doctrines. *Moore ex rel. Moore,* 87 S.W.3d at 285. For tort claims, Missouri applies the test set forth in the Restatement (Second) of Conflict of Laws Section 145 (1971). *Id.*

■ Section 145 provides:

(1): The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in section 6.

(2) Contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Here, the injuries occurred in California. Plaintiffs came into contact with PCBs in California predominantly. Plaintiffs all reside in California. Plaintiffs have no relationship with Pharmacia other than coming into contact with its products in California. Further, the parties all agree that California law applies to the substantive claims in this case. Therefore, we will look to California substantive law when evaluating the merits of Plaintiffs' points.

We will begin with Plaintiffs' third point. In their third point, Plaintiffs argue the trial court erred in granting summary judgment with respect to Plaintiffs' cause of action for negligence brought under California law because Plaintiffs established Pharmacia owed a duty of reasonable care. We agree.

■ The existence of a duty is a question of law for the court. *Lawson v. Safeway, Inc.,* 191 Cal.App.4th 400, 416, 119 Cal.Rptr.3d 366 (Cal.App. 1 Dist.2010). Section 1714 of the California Civil Code provides: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." Thus, according to Section 1714, generally everyone in California has a duty to exercise reasonable care. However, some exceptions have been carved out from this general principle, though such exceptions have only been made where they are clearly supported by public policy. *Rowland v. Christian,* 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561, 564 (1968). In fact, departures from the fundamental principle of Section 1714 involve the balancing of a number of considerations, which have been deemed "the *Rowland* factors" and include the foreseeability of harm to the plaintiff, the degree of certain-

ty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. *Id.* Foreseeability and extent of burden to the defendant have evolved to become the primary *Rowland* factors to be considered on the question of legal duty. *Campbell v. Ford Motor Co.*, 206 Cal.App.4th 15, 33, 141 Cal.Rptr.3d 390 (Cal.App. 2 Dist.2012). The *Rowland* factors are evaluated at a relatively broad level of factual generality. *Cabral v. Ralphs Grocery Co.*, 51 Cal.4th 764, 122 Cal.Rptr.3d 313, 248 P.3d 1170, 1175 (2011).

■■ In evaluating the *Rowland* factors, we first examine the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, and the closeness of the connection between the defendant's conduct and the injury suffered. *Campbell*, 206 Cal.App.4th at 29, 141 Cal. Rptr.3d 390. Thus, as to foreseeability, we have explained that the court's task in determining duty is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed. *Cabral*, 122 Cal.Rptr.3d 313, 248 P.3d at 1175.[3] By making exceptions to Civil Code Section 1714's general duty of

ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, the court preserves the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the court to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the jury to make. *Id.* While the court deciding duty assesses the foreseeability of injury from the category of negligent conduct at issue, if the defendant did owe the plaintiff a duty of ordinary care, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. *Id.* An approach that instead focused the duty inquiry on case-specific facts would tend to eliminate the role of the jury in negligence cases, transforming the question of whether a defendant breached the duty of care under the facts of a particular case into a legal issue to be decided by the court. *Id.*

In this case, Plaintiffs argued the category of conduct at issue was the manufacture and sale of chemicals. Pharmacia argued the category of conduct was protecting Plaintiffs from the conduct of downstream users of PCBs and/or injuries caused by the presence of PCBs in the environment. The trial court agreed with Pharmacia, finding the category of conduct at issue should not be the broadest possible category, but should be narrowed so the general duty rule still applies in the broadest context and exemptions are only carved out in exceptional circumstances.

■ However, we find the category of conduct identified by the trial court is not appropriate for a categorical "no duty"

---

3. As several tort law scholars who filed an amicus brief in support of Plaintiffs suggest, viewing the question of duty as a categorical determination rather than as a fact-specific inquiry has the benefit of providing clearer rules of behavior for actors who may be subject to tort liability and who structure their behavior in response to that potential liability.

rule. The trial court's inquiry is too dependent on the facts detailing how the particular PCBs to which Plaintiffs were exposed reached the environment. Moreover, the trial court's attempt to analogize its determination of a category of conduct to other factually distinct California cases is unconvincing. Defining the category of conduct is part of the court's determination of whether a duty of care exists, as Pharmacia acknowledges in its brief. *See generally Lawson,* 191 Cal.App.4th at 416, 119 Cal.Rptr.3d 366. Thus, it is a matter we review *de novo.*

Here, the trial court noted Plaintiffs could not specify when the PCBs in their blood were manufactured or what path they took from the manufacturer to each Plaintiff and that it was possible the Plaintiffs ingested PCBs illegally dumped by third parties decades after they were manufactured. While these facts may prove to be true, this determination is for a fact-finder, not for the court determining whether a general duty of care was owed.

■ Further, the trial court's category of conduct does not actually describe any conduct of Pharmacia. We find the appropriate category of conduct was the design, manufacturing, and distribution of PCBs. In other words, Pharmacia could have a duty to exercise reasonable care in the design, manufacture, and distribution of PCBs. This category of conduct identifies and targets the actual conduct at issue—design, manufacturing, and distribution of PCBs, a unique class of chemicals resistant to environmental breakdown—but is not so expansive that it includes the very broad category of all chemicals.

■ Now that we have identified an appropriate category of conduct, we turn to the question of foreseeability. The court's task in determining foreseeability is to evaluate more generally whether the category of negligent conduct at issue is

sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed. *Cabral,* 122 Cal. Rptr.3d 313, 248 P.3d at 1175.

In this case, Plaintiffs allege Pharmacia chose not to test whether PCBs are capable of causing cancer based on long-term exposures, despite having knowledge as early as 1938 according to Dr. Rosner's affidavit, that acute exposure to PCBs caused acute systemic toxic effects. Further, according to Plaintiffs, Pharmacia marketed PCBs for "open use," where releases into the environment are uncontrollable, despite having knowledge that PCBs, by design, would not easily degrade in the environment. Plaintiffs claim Pharmacia also had actual knowledge that huge quantities of PCBs were being released into the environment as waste. Plaintiffs also allege Pharmacia failed to test to determine whether PCBs were accumulating in the environment in the same way as other chlorinated hydrocarbons and that Pharmacia failed to phase out production and marketing of PCBs upon learning they were permeating the environment. Lastly, Plaintiffs provided evidence linking PCBs in the environment to the development of cancer.

These allegations show it was generally foreseeable that the design, manufacture, and distribution of PCBs could result in the type of injuries Plaintiffs experienced. Further, there is no question Plaintiffs suffered injuries. However, whether, as a matter of fact, Pharmacia's conduct was connected closely enough that it can be said it resulted in the particular injuries of Plaintiffs in this case is a matter for a jury to decide.

The trial court relies on several cases where the courts found the defendants owed no duty, even though, according to Pharmacia "there was a much more direct

connection between the defendants' conduct and the plaintiffs' injuries." For example, in *Tucker v. CBS Radio Stations, Inc.*, 194 Cal.App.4th 1246, 124 Cal.Rptr.3d 245 (2011), the court found the host of an ATV event did not owe a duty to a non-paying participant. We find this case is factually inapposite to the instant case. While the court applied the *Rowland* factors to find the defendant did not owe a duty of care, the category of conduct, the facts, and the foreseeability analysis are all distinguishable from the instant case.

In *Oddone v. Superior Court*, 179 Cal.App.4th 813, 820, 101 Cal.Rptr.3d 867 (2009), another case the trial court relied on, the court applied the Rowland factors, but found the plaintiff failed to satisfy the factor relating the closeness of the connection between the defendant's conduct and the injury suffered. This case involved an employee who died from brain cancer and whose surviving wife sued Technicolor, alleging she was injured by exposure to toxic chemicals while her husband was working there. *Id.* at 815, 101 Cal.Rptr.3d 867. The chief failing of the plaintiff was that she failed to allege with enough specificity which chemicals she was exposed to and how they caused her injury. *Id.* at 824, 101 Cal.Rptr.3d 867. However, the court also noted finding the defendant had a duty to non-employees would be too great a burden to impose on an employer for policy reasons. *Id.* at 823, 101 Cal.Rptr.3d 867. Thus, the court found the defendant did not owe a duty to the plaintiff, although it was very careful to specify that this was its conclusion "given the allegations of this complaint." *Id.* Thus, again, this case is factually distinguishable from the instant case, which sufficiently alleges facts supporting Plaintiffs' argument that Pharmacia owed them a duty of care.

Another case relied on by the trial court involved the accidental misuse of a skylight. *Romito v. Red Plastic Co.*, 38 Cal.App.4th 59, 63, 44 Cal.Rptr.2d 834 (1995). In that case, an electrician accidentally fell through a skylight, and the court found the skylight manufacturer owed no duty of care to protect against the innumerable unforeseeable risks surrounding the accidental misuse of its product. *Id.* at 68, 44 Cal.Rptr.2d 834. Notably, it was not suggested that skylights were unsafe for the purpose for which they were intended. On the other hand, Plaintiffs allege PCBs, especially those utilized in "open-use" products, were unsafe for the purpose for which they were intended.

Lastly, the trial court relies on a few asbestos cases to conclude there is no duty when the connection between the defendant's conduct and the injured party is attenuated and the injury manifests decades after the exposure. One case was *Campbell*, 206 Cal.App.4th at 15, 141 Cal.Rptr.3d 390, which is a premises liability case and is thus distinguishable from this case. The other was *Taylor v. Elliott Turbomachinery Co., Inc.*, 171 Cal.App.4th 564, 571, 90 Cal.Rptr.3d 414 (2009) where the defendants were not the manufacturers of the asbestos containing parts. The trial court framed the question in that case as follows: "can a manufacturer reasonably be expected to foresee the risk of latent disease arising from products supplied by others that may be used with the manufacturer's product years or decades after the product leaves the manufacturer's control?" *Id.* at 594, 90 Cal.Rptr.3d 414. In answering that question, the court noted the connection between the defendants' conduct and the plaintiff's injury was remote. *Id.* The defendants sold equipment to the Navy in the early 1940s, and it is undisputed that they were not the manufacturers or suppliers of the injury-causing products that the plaintiff encountered during his military service some 20 years later. *Id.* Thus, the court based its

holding in part on the fact that the defendants were not the manufacturers or suppliers of the injury-causing products. On the other hand, the circumstances surrounding the design, production, and distribution of PCBs in this case are precisely the opposite. The defendant is the designer, manufacturer, and distributor of the PCBs, not the products into which PCBs were later incorporated. Thus, we find the trial court's reliance on *Taylor* was misplaced.

■■■ We find the Plaintiffs provided evidence showing Pharmacia had a duty to exercise reasonable care in the design, manufacture, and distribution of PCBs because it was generally foreseeable that such a category of conduct could result in the harm experienced by Plaintiffs. PCBs are unique chemicals in that they are very stable and resistant to environmental breakdown or alteration. Further, Plaintiffs provided evidence that the presence of PCBs in the environment resulted in an increased risk of cancer for those exposed to PCBs. Therefore, given the nature of PCBs, the lapse between their creation and Plaintiffs' injuries is somewhat irrelevant. We find in this case the specific factual questions regarding foreseeability and proximate cause should be handled by the fact-finder, not by a court making determinations of duty as a matter of law.

■■■ At this point, we have determined the harms resulting from exposure to PCBs were, in the general sense, foreseeable. However, before making a final determination of whether to impose a duty, we still must examine whether the public policy factors identified in *Rowland*—the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the

availability, cost, and prevalence of insurance for the risk involved—justify creating a duty exception in this case. *Campbell,* 206 Cal.App.4th at 31, 141 Cal.Rptr.3d 390. The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible. *Cabral,* 122 Cal. Rptr.3d 313, 248 P.3d at 1182. The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability. *Id.* We must consider whether there is any state policy, such as would clearly justify an exception to the general duty of ordinary care, promoting or protecting the activity of designing, manufacturing, and distributing PCBs. *See id.*

■■■ In this case, we find there is no such state policy. Plaintiffs alleged Pharmacia basically had a monopoly on the design, marketing, and production of all domestically-produced PCBs. As a result, Pharmacia was the only entity that could have prevented PCBs from becoming ubiquitous in the environment. Thus, Plaintiffs contend the possibility of holding Pharmacia accountable is commensurate with the risks it created by designing, marketing, and producing PCBs.

Pharmacia argues the idea that it had a monopoly and was the only one that could prevent production of PCBs is mere speculation. Pharmacia also contends finding a duty here would mean it owes a duty to a potentially limitless pool of plaintiffs and would open St. Louis courts to a flood of litigation.

First, we note Pharmacia was very successful in designing, manufacturing, and distributing PCBs, but it would not be sound policy to find it can escape liability for the harmful effects of those PCBs as a

result of its success in making them ubiquitous. Ubiquity cannot be allowed to preclude liability. Such a finding might reduce the precautions a manufacturer would take to produce a safe product, knowing that if it just made enough of such a product, it could escape liability. Further, while we have found Plaintiffs have sufficiently alleged the possibility of causation, whether in fact their exposure to PCBs did cause their cancer is a matter for the jury. However, we note if a jury found PCBs were the cause of Plaintiffs cancer, there would be a fair amount of moral blame heaped upon Pharmacia for making PCBs ubiquitous in our environment, thus potentially exposing everyone to increased risks of cancer. Lastly, while imposing a duty will do little to prevent future harm from PCBs, which have been banned and are no longer produced, the imposition of a duty serves as a warning for manufacturers creating potentially dangerous products to be cautious.

Thus, our consideration of the public policy factors in Rowland does not persuade us that this is a category of cases where we should find Pharmacia does not owe a duty of care as a matter of public policy.

Therefore, we find the trial court erred in granting summary judgment with respect to Plaintiffs' cause of action for negligence brought under California law because Plaintiffs established Pharmacia owed a duty of reasonable care. Point granted.

In their first point, Plaintiffs argue the trial court erred in granting summary judgment with respect to Plaintiffs' cause of action for design defect brought under California law because the post-use disposal of PCBs was foreseeable in that Plaintiffs produced evidence demonstrating that Pharmacia knew or should have known many of its PCBs would be disposed of into the environment. We agree.

■■■■ The elements of a strict products liability cause of action are a defect in the manufacture or design of the product or a failure to warn, causation, and injury. *Nelson v. Superior Court*, 144 Cal.App.4th 689, 695, 50 Cal.Rptr.3d 684 (2006). More specifically, plaintiff must ordinarily show: (1) the product is placed on the market; (2) there is knowledge that it will be used without inspection for defect; (3) the product proves to be defective; and (4) the defect causes injury. *Id.* A product can be found to be defective under one of two tests: the consumer expectations test, or the risk-benefit test. *Perez v. VAS S.p.A.*, 188 Cal.App.4th 658, 676, 115 Cal.Rptr.3d 590 (2010). Here, we are dealing with the risk-benefit test because a normal consumer would not know what to expect concerning a safe design of a PCB. *See Id.* at fn. 4. Under the risk-benefit test, a product is defective in design if the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design. *Id.* at 676, 115 Cal. Rptr.3d 590. A product may be found defective in design if through hindsight, the jury determines the product's design embodies "excessive preventable danger," or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design. *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 430, 143 Cal.Rptr. 225, 573 P.2d 443 (1978). Past cases indicate that in evaluating the adequacy of a product's design pursuant to this standard, a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical

feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.[4] *Id.* at 431, 143 Cal.Rptr. 225, 573 P.2d 443. Because most of the evidentiary matters that may be relevant to the determination of the adequacy of a product's design under the "risk-benefit" standard, e.g., the feasibility and cost of alternative designs are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, we conclude that once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective. *Id.* Moreover, inasmuch as this conclusion flows from our determination that fundamental public policy dictates that a manufacturer that seeks to escape liability for an injury proximately caused by its' product's design on a risk-benefit theory should bear the burden of persuading the trier of fact that its' product should not be judged defective, the defendant's burden is one affecting the burden of proof, rather than simply the burden of producing evidence. *Id.* at 431–32, 143 Cal.Rptr. 225, 573 P.2d 443.

 Thus, under this framework, at trial, the plaintiff bears an initial burden of making a prima facie showing that the injury was proximately caused by the product's design. *Perez,* 188 Cal.App.4th at 678, 115 Cal.Rptr.3d 590. This showing requires evidence that the plaintiff was injured while using or coming into contact with the product in an intended or reasonably foreseeable manner and that the plaintiff's ability to avoid injury was frustrated by the absence of a safety device, or by the nature of the product's design. *Id.* If this prima facie burden is met, the burden of proof shifts to the defendant to prove, in light of the relevant factors, that the product is not defective. *Id.* Importantly, the plaintiff's prima facie burden of producing evidence that injury occurred while the product was being used in an intended or reasonably foreseeable manner must be distinguished from the ultimate burden of proof that rests with the defendant to establish that its product was not defective because the plaintiff's injury resulted from a misuse of the product. *Id.* Product misuse, an affirmative defense, is a superseding cause of injury that absolves a tortfeasor of his or her own wrongful conduct only when the misuse was so highly extraordinary as to be unforeseeable. *Chavez v. Glock, Inc.,* 207 Cal.App.4th 1283, 1308, 144 Cal.Rptr.3d 326 (2012). Thus, foreseeability is relevant in a strict liability analysis to determine whether injury is likely to result from a potential use or misuse of a product. *O'Neil,* 53 Cal.4th at 362, 135 Cal.Rptr.3d 288, 266 P.3d 987. Moreover, foreseeability, in this context, is a question for the jury unless undisputed facts leave no room for a reasonable difference of opinion. *Chavez,* 207 Cal.App.4th at 1308, 144 Cal.Rptr.3d 326.

4. Pharmacia argues these "relevant factors" in the risk-benefit test include the *Rowland* factors. However, we find the *Rowland* factors are not applicable to our inquiry into strict liability for design defect. *See generally O'Neil v. Crane Co.,* 53 Cal.4th 335, 135 Cal. Rptr.3d 288, 266 P.3d 987 (2012)(separating its analysis of strict liability from its analysis of negligence and the *Rowland* factors). Even if we were to apply the *Rowland* factors to our determination of foreseeability in relation to our strict liability analysis, as the court did in *Romito,* 38 Cal.App.4th at 70, 44 Cal. Rptr.2d 834, we have already decided above that Pharmacia owed a duty of reasonable care to Plaintiffs. Thus, the *Rowland* factors will similarly not relieve Pharmacia from strict liability for design defect.

The philosophy of California courts evolves naturally from the purpose of imposing strict liability, which is to ensure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. *Nelson,* 144 Cal.App.4th at 695, 50 Cal.Rptr.3d 684. In fact, if anything, California courts find bystanders should be given greater protection than consumers and users where harm to bystanders from a defect is reasonably foreseeable. *Id.* Consumers and users, at least, have the opportunity to inspect for defects and to limit their purchases to articles manufactured by reputable manufacturers and sold by reputable retailers, whereas the bystander ordinarily has no such opportunities. *Id.* Considering the purposes of bystander liability and the fact that California law applies to products once they are placed on the market, the class of uses that may be foreseen by the manufacturer must necessarily be quite broad. *Id.* If a manufacturer may be required to reasonably foresee misuse or abuse of a product by a user or third party in some circumstances, the same manufacturer should also foresee normal storage and movement of the product while it is still on the market. *Id.*

The trial court found Pharmacia could not be held strictly liable for injuries caused by PCBs in the environment resulting from unforeseeable and unintended uses. In so holding, the trial court relied on several non-California cases. These cases focused on whether dumping, disposal, scrapping, recycling, incineration, and destruction of PCBs and PCB-containing products by third parties were intended or foreseeable uses.[5] The court in *Pennsylvania Dept. of Gen. Services* noted a manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a manufacturer. *Pennsylvania Dept. of Gen. Services,* 587 Pa. at 259, 898 A.2d 590. Further, the court stated it construed the intended use criterion strictly, holding that foreseeable misuse of a product will not support a strict liability claim. *Id.* This case exhibits a clear difference between strict liability for design defect in Pennsylvania and strict liability for design defect in California. In addition, in jurisdictions where foreseeable misuse is recognized, as in California, whether there is liability as a matter of law will depend on the specific factual records of each case.

Thus, we find the trial court erred in holding Pharmacia could not be held strictly liable for injuries caused by PCBs in the environment resulting from unforeseeable and unintended uses. In so holding the trial court incorrectly made a determination that post-use disposal of PCBs was unforeseeable, which is a determination for a fact-finder. In addition, as evidenced above, the law in California pertaining to strict liability for design defect provides more broad coverage in that it includes the foreseeable misuse of a product. *Chavez,* 207 Cal.App.4th at 1308, 144 Cal.Rptr.3d 326.

**5.** See *United States v. Union Corp.,* 277 F.Supp.2d 478, 493 (E.D.Pa.2003); *Richmond, Fredericksburg & Potomac R. Co. v. Davis Indus., Inc.,* 787 F.Supp. 572, 578 (E.D.Va.1992); *Kalik v. Allis–Chalmers Corp.,* 658 F.Supp. 631, 635 (W.D.Pa.1987); *Penn-* *sylvania Dept. of Gen. Services v. U.S. Mineral Products Co.,* 587 Pa. 236, 259, 898 A.2d 590 (2006); *Monsanto Co. v. Reed,* 950 S.W.2d 811, 814 (Ky.1997); *High v. Westinghouse Elec. Corp.,* 610 So.2d 1259, 1262 (Fla.1992).

■ Here, Plaintiffs have shown there is a genuine issue of material fact regarding whether their injuries were caused by a foreseeable misuse of PCB-containing products. Plaintiff's expert, Dr. Rosner, testified he reviewed thousands of pages of internal Pharmacia documents and concluded Pharmacia knew or should have known its PCBs would be dumped into the environment by third parties. Further, the laboratory analyses of the blood of Plaintiffs showed each of them have elevated levels of PCBs in their blood. Lastly, Dr. Shira Kramer, Plaintiffs' expert epidemiologist, described how the risk of Non–Hodgkin's Lymphoma increases with increasing levels of PCBs in the blood, and that Plaintiffs' PCB blood levels show that PCBs were a substantial factor in the development of their lymphomas.

■ Therefore, the trial court erred in granting summary judgment with respect to Plaintiffs' cause of action for design defect brought under California law because Pharmacia could be held strictly liable for injuries caused by PCBs in the environment resulting from some unintended uses. Further, Plaintiffs showed there were genuine issues of material fact regarding whether post-use disposal of PCBs was foreseeable and whether exposure to PCBs caused their injuries. Point granted.

In their second point, Plaintiffs argue the trial court erred in granting summary judgment with respect to Plaintiffs' cause of action for design defect brought under California law because the foreseeable and intended uses of Pharmacia's "open use" PCBs resulted in releases into the environment, which, in turn, resulted in an increase in Plaintiffs' risk of developing Non–Hodgkin's Lymphoma. We agree.

Because this point also involves strict liability for design defect, our legal analysis from point one above applies here as well.

The trial court seems to indicate "open-use" PCBs were defective, but it did not find for Plaintiffs because it determined they could not prove whether the PCBs in their blood were from "open-use" PCBs or from other PCB sources.

However, in *Rutherford v. Owens–Illinois, Inc.*, 16 Cal.4th 953, 982, 67 Cal. Rptr.2d 16, 941 P.2d 1203 (1997), the Supreme Court of California found:

[i]n the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a "legal cause" of his injury, i.e., a substantial factor in bringing about the injury. In an asbestos-related cancer case, the plaintiff need not prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it contributed to the plaintiff or decedent's risk of developing cancer.

Further, we note at least one California court has applied the reasoning of Rutherford outside the asbestos context. *See Bockrath v. Aldrich Chemical Co., Inc.*, 21 Cal.4th 71, 79–80, 86 Cal.Rptr.2d 846, 980 P.2d 398 (1999)(where the plaintiff alleged exposure to numerous toxic chemicals caused his cancer). Thus, we find similarly that Plaintiffs must show some threshold exposure to PCBs and must prove that exposure was a substantial factor causing the illness by showing by a reasonable medical probability that Plaintiffs' exposure contributed to Plaintiffs' risk of developing cancer.

Here, Plaintiffs have shown there is a genuine issue of material fact regarding whether their injuries were caused by foreseeable and intended uses of open-use PCB-containing products. Dr. Rosner testified Pharmacia should have known that its sales of PCBs for "open uses" would result in substantial releases of those PCBs into the environment. Plaintiffs provided internal Pharmacia documents indicating "open use" PCBs were the major source of PCBs entering the environment. Dr. Donna Vorhees, Plaintiffs' expert on the environmental fate and transport of PCBs, testified that most environmental and biological samples of PCBs, including Plaintiffs' blood serum, include PCBs that were released to the environment from "open uses." Further, the laboratory analyses of the blood of Plaintiffs showed each of them have elevated levels of PCBs in their blood. Lastly, Dr. Shira Kramer, Plaintiffs' expert epidemiologist, described how the risk of Non–Hodgkin's Lymphoma increases with increasing levels of PCBs in the blood, and that Plaintiffs' PCB blood levels show that PCBs were a substantial factor in the development of their lymphomas.

Therefore, we find the trial court erred in granting summary judgment with respect to Plaintiffs' cause of action for design defect brought under California law because Plaintiffs showed there was a genuine issue of material fact regarding whether Plaintiffs' injuries were caused by foreseeable and intended uses of open-use PCB-containing products. Point granted.

The judgment of the trial court is reversed and remanded.

ROY L. RICHTER and ANGELA T. QUIGLESS, JJ., concur.